UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
SHIRLEY BURCH, administratrix for the estate of
Lois Coleman, deceased, and in her own right,

                Plaintiff,                           **MEMORANDUM AND ORDER**
                                                                     18-CV-3000 (RPK) (ST)

     -against-

1412 LANSDOWNE OPERATING, LLC, d/b/a
St. Francis Center for Rehabilitation & Healthcare,
and CENTER MANAGEMENT GROUP, LLC,

                Defendants.
----------------------------------------------------------------X
RACHEL P. KOVNER, United States District Judge:

       Plaintiff Shirley Burch is the representative for the estate of Lois Coleman, her mother, who died in 2017 from injuries she allegedly sustained at a nursing home in Pennsylvania. Plaintiff filed this action against the owners and operators of the nursing home, 1412 Lansdowne Operating, LLC, and Center Management Group, LLC, raising negligence, wrongful death, and survival claims under Pennsylvania state law and seeking compensatory and punitive damages. Defendants have moved to dismiss the action and compel arbitration of plaintiff's claims. For the reasons below, defendants' motion to dismiss is denied. Defendants' motion to compel arbitration is granted in part and denied in part, and the action is stayed pending arbitration.

## BACKGROUND

       The following facts are taken from the complaint and documents that were submitted by both parties in connection with defendants' motion to compel arbitration. In November 2014, plaintiff's mother, Lois Coleman, was admitted to St. Francis Center for Rehabilitation & Healthcare ("St. Francis Center"), a nursing home in Pennsylvania. Second Am. Compl. ("SAC") ¶¶ 2-3 (Dkt. #41). At all relevant times, St. Francis Center was owned, operated, controlled,

1

directed, and managed by defendants 1412 Lansdowne Operating, LLC, and Center Management Group, LLC.  *Id.* ¶¶ 5, 7.  According to the complaint, the purpose of Ms. Coleman's stay at St. Francis Center "was for short term rehabilitation to increase her leg strength and ambulatory skills" after hip replacement surgery.  *Id.* ¶¶ 11-12.

At the time she was admitted, Ms. Coleman signed a "Short-Term Admission Agreement." Defs.' Mot. to Dismiss Ex. D at 12 ("the Agreement") (Dkt. #42-7).  The Agreement states that both the resident and the facility agree to the agreement's terms "in consideration of Resident's admission to the Facility for a Short-term Rehabilitation Stay."  *Id.* at 1.  The Agreement includes a section on the "Facility's Grievance Procedure": unless the parties agree to resolve a given dispute through mediation, "the dispute may only be resolved by arbitration as provided in th[e] Agreement."  *Id.* at 6.  Under a section in capital letters labeled "Mandatory, Binding Arbitration," the Agreement defines "arbitration" as "a specific process of dispute resolution utilized instead of the traditional state or federal court system."  *Id.* at 7.  The Agreement states, "When arbitration is mandatory, it is the only legal process available to the parties.  Mandatory arbitration has been selected with the goal of reducing the time, formalities and cost of utilizing the court system." *Ibid.*

Under a subsection labeled "Personal Injury or Medical Malpractice," the Agreement provides, again in capital letters, "Unless resolved or settled by mediation, any claim that the resident may have against the facility for any personal injuries sustained by the resident arising from or relating to any alleged medical malpractice, inadequate care, or any other cause or reason while residing in the facility, shall be settled exclusively by arbitration."  *Id.* at 8.

The Agreement then states, in capital letters and bolded text:

This means that the resident will not be able to file a lawsuit in any court to bring any claims that the resident may have against the facility for personal injuries incurred while residing in the facility. It also means that the resident is relinquishing or giving up all rights that the resident may have to a jury trial to litigate any claims for damages or losses allegedly incurred as a result of personal injuries sustained while residing in the facility.

*Ibid.* The Agreement states, in capital letters, that "[t]he costs of the arbitration shall be borne equally by each party, and each party shall be responsible for their own legal fees." *Id.* at 10. And it provides, in capital letters, that "any . . . personal injury claim or medical malpractice claim arising out of or involving the residency of the resident at the facility is subject to" the mandatory arbitration agreement. *Id.* at 11.

The Agreement also states that it "shall be governed and construed in accordance with" Pennsylvania law, and that it "shall be binding and inure to the benefit of each of the undersigned parties and their respective heirs, personal representatives, successors and assigns." *Id.* at 5.

On the penultimate page of the Agreement, just above two lines for signatures, is the statement, "Resident . . . acknowledge[s] that they have read and understand the terms of the mandatory, binding arbitration clause, that the terms have been explained to them by a representative of the Facility, and that they have had an opportunity to ask questions about such clause." *Id.* at 11.

On the last page of the Agreement are three signatures. *Id.* at 12. One signature line is labeled "Resident" and is signed by Ms. Coleman. *Ibid.* There is also a signature on a line labeled "Witness" and a signature on a line for an "Authorized Representative" of St. Francis Center. *Ibid.*

Ms. Coleman was a resident of St. Francis Center from 2014 to 2017. SAC ¶ 14. St. Francis Center maintained progress notes regarding her condition there. *See* Pl.'s Mem. in Opp'n

to Mot. to Dismiss ("Pl.'s Opp'n") Ex. C (Dkt. #43-4). The four progress notes dated between September 2015 and February 2017 state that Ms. Coleman was at St. Francis Center for "LTC placement," which defendants do not dispute means long-term care placement. *Id.* at 1; *see* Pl.'s Opp'n at 6 (Dkt. #43).

Records of the Pennsylvania Department of Human Services reflect that Ms. Coleman was discharged from St. Francis Center to a hospital in Pennsylvania in August 2017. *See* Pl.'s Opp'n Ex. B at 5 (Dkt. #43-3). Ms. Coleman died at the hospital's hospice unit from injuries caused by septicemia, septic shock, ulcers, bacterial infections, renal failure due to dehydration, pneumosepsis, malnutrition, and severe muscle deconditioning, among other conditions. SAC ¶ 20. Plaintiff was later appointed administratrix of Ms. Coleman's estate. *Id.* ¶ 2.

Plaintiff filed this lawsuit, and later the operative second amended complaint, alleging that Ms. Coleman's injuries were caused by defendants' failure to provide her with adequate medical and nursing care. *See generally* Compl. (Dkt. #1); *see* SAC ¶¶ 20, 28, 31-32. Defendants have moved to dismiss the second amended complaint and compel arbitration. *See* Defs.' Mem. of L. in Supp. of Mot. to Dismiss ("Defs.' Br.") at 1, 3-6 (Dkt. #42-10). In the alternative, defendants move to dismiss defendant 1412 Lansdowne Operating based on lack of personal jurisdiction, and to dismiss the case based on *forum non conveniens*. *See id.* at 1, 6-14.

## STANDARD OF REVIEW

Courts in this circuit commonly construe a motion to dismiss based on an arbitration clause as a motion to compel arbitration. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016); *see also, e.g., Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374, 390 (S.D.N.Y. 2021); *Begonja v. Vornado Realty Tr.*, 159 F. Supp. 3d 402, 405 n.1 (S.D.N.Y. 2016). A court may resolve a motion to compel arbitration before addressing a motion to dismiss based on lack of personal

4

jurisdiction or *forum non conveniens*.  See *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("[A] federal court has leeway to choose among threshold grounds for denying audience to a case on the merits." (quotations omitted)); *see also, e.g.*, *Lewis v. ANSYS, Inc.*, No. 19-CV-10427, 2021 WL 1199072, at *3 (S.D.N.Y. Mar. 30, 2021); *In re Residential Cap., LLC*, 563 B.R. 756, 766 (Bankr. S.D.N.Y. 2016); *Ramasamy v. Essar Glob. Ltd.*, 825 F. Supp. 2d 466, 467 n.1 (S.D.N.Y. 2011).

When deciding a motion to compel arbitration, courts apply a "standard similar to that applicable for a motion for summary judgment." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quotations omitted); *see Gonder v. Dollar Tree Stores, Inc.*, 144 F. Supp. 3d 522, 525 (S.D.N.Y. 2015).  On such a motion, "the court consider[s] all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party." *Meyer*, 868 F.3d at 74 (quotations omitted).  A trial is necessary "[i]f there is an issue of fact as to the making of the agreement for arbitration," but "where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law," a court may "rule on the basis of that legal issue and avoid the need for further court proceedings." *Nicosia*, 834 F.3d at 229 (citations omitted).

## DISCUSSION

Under the Federal Arbitration Act ("FAA"), a "written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  This provision "establishes a liberal federal policy favoring arbitration

5

agreements." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quotations omitted); *see Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006) ("[I]t is difficult to overstate the strong federal policy in favor of arbitration[.]").

The "party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.-Ala. V. Randolph*, 531 U.S. 79, 91-92 (2000)).  Plaintiff seeks to avoid arbitration here on the grounds that (1) Ms. Coleman did not agree to arbitrate claims arising from long-term care at St. Francis Center; (2) defendants cannot enforce the Agreement; (3) the Agreement is unconscionable; and (4) the Agreement was not supported by consideration.  As explained below, plaintiff's arguments lack merit.

I. **The parties agreed to arbitrate Ms. Coleman's claims.**

Plaintiff first argues that Ms. Coleman did not agree to arbitrate claims arising from her residency at St. Francis Center because the Agreement governs "short-term" admissions to the facility.  *See* Pl.'s Opp'n at 9-10.  "[T]he existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 395 (2d Cir. 2015); *see Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019).  To determine whether a plaintiff's claims fall within the scope of an arbitration agreement, courts "analyze the factual allegations made in the plaintiff's complaint." *Holick*, 802 F.3d at 395 (citation omitted).  "If the allegations underlying the claims

6

touch matters covered by the parties' agreements, then those claims must be arbitrated, whatever the legal labels attached to them." *Ibid.* (quotations omitted).

In interpreting an arbitration agreement, a federal court looks to "state contract law principles." *Abdullayeva v. Attending Home Care Servs. LLC*, 928 F.3d 218, 222 (2d Cir. 2019); *see Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012). Here, the Agreement states that it "shall be governed and construed in accordance with" Pennsylvania law, Agreement at 5, and the parties agree that Pennsylvania law provides the contract-law principles that are relevant in this case. *See* Defs.' Br. at 5; Pl.'s Opp'n at 9. "Pennsylvania has a well-established public policy that favors arbitration," which "aligns with" federal law. *MacPherson v. Magee Mem'l Hosp. for Convalescence*, 128 A.3d 1209, 1219 (Pa. Super. Ct. 2015) (quotations omitted). "This policy applies equally to all arbitration agreements, including those involving nursing homes." *Ibid.* (citing *Marmet Health Care Ctr., Inc. v. Brown*, 132 S. Ct. 1201, 1203-04 (2012)). In determining whether parties have entered a valid agreement to arbitrate, "courts generally should apply ordinary state-law principles that govern the formation of contracts, but in doing so, must give due regard to the federal policy favoring arbitration." *Ibid.* (quotations omitted). Furthermore, "where the arbitration provision is a broad one, and '[i]n the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'" *Provenzano v. Ohio Valley Gen. Hosp.*, 121 A.3d 1085, 1096 (Pa. Super. Ct. 2015) (quoting *E.M. Diagnostic Sys., Inc. v. Local 169*, 812 F.2d 91, 95 (3d Cir. 1987)).

Plaintiff argues that the arbitration clause does not apply because she was a long-term resident of the nursing home when her claims arose. Pl.'s Opp'n at 6, 9-10. But under Pennsylvania law, "[i]t is firmly settled that the intent of the parties to a written contract is

7

contained in the writing itself." *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, 739 A.2d 133, 138 (Pa. 1999). "When the words of a contract are clear and unambiguous, the intent is to be found only in the express language of the agreement." *Ibid.* Here, the parties unambiguously agreed to arbitrate "*any* claim that the resident may have against the facility for any personal injuries sustained by the resident arising from or relating to any alleged medical malpractice, inadequate care, or any other cause or reason *while residing in the facility*." Agreement at 8 (emphasis added). The Agreement further states, in capital and bolded letters, that a resident "will not be able to file a lawsuit in any court to bring any claims that the resident may have against the facility for personal injuries incurred *while residing in the facility*." *Ibid.* (emphasis added). And it adds that the resident is "giving up all rights that the resident may have to a jury trial to litigate any claims for damages or losses allegedly incurred as result of personal injuries sustained *while residing in the facility*." *Ibid.* (emphasis added). Plaintiff suggests that Ms. Coleman's claims were nevertheless non-arbitrable because the Agreement contemplated that Ms. Coleman's admission to the facility was for a "[s]hort-term [r]ehabilitation stay," meaning "on a short-term basis for rehabilitative purposes only," Pl.'s Opp'n at 9 (quoting Agreement at 1), when in fact Ms. Coleman remained a resident for nearly three years and her progress notes stated that she received "long term care," *id.* at 6, 9-10; *see id.* Ex. C. But even if Ms. Coleman stayed longer than the parties contemplated in the Agreement, the Agreement unambiguously requires arbitration of any claims arising from personal injuries that Ms. Coleman suffered at the facility, because it

8

covers any such claims "for personal injuries incurred while residing at the facility"—without regard to whether the residency was long-term or short-term. *See* Agreement at 8.

## II. Defendants may invoke the arbitration agreement.

Plaintiff next argues that she is not bound to arbitrate her dispute with defendants because they are not parties to the Agreement. *See* Pl.'s Opp'n at 10-12. The Agreement is signed by Ms. Coleman, a witness, and an "authorized representative" of St. Francis Center, but not representatives for 1412 Lansdowne Operating or Center Management Group. *See* Agreement at 12. Plaintiff does not dispute that, as administratrix of Ms. Coleman's estate, plaintiff is bound to arbitrate claims that Ms. Coleman would have been bound to arbitrate had Ms. Coleman brought those claims on her own behalf. *See Peltz ex rel. Est. of Peltz v. Sears, Roebuck & Co.*, 367 F. Supp. 2d 711, 718 (E.D. Pa. 2005) (stating that the administrator of an estate "merely stands in [the] shoes" of a decedent who signed an arbitration agreement and is therefore bound to arbitrate claims brought on behalf of the estate). Plaintiff contends only that defendants cannot enforce the Agreement because it was intended to bind only Ms. Coleman and St. Francis Center and does not cover claims that arose from defendants' negligence "after their purchase of the facility." Pl.'s Opp'n at 10. This argument lacks merit.

Defendants are entitled to invoke the Agreement's arbitration procedures. Under Pennsylvania law, "non-signatories to an arbitration agreement may enforce such an agreement when there is an obvious and close nexus between the non-signatories and the contract or the contracting parties." *Noye v. Johnson & Johnson Servs.*, 765 F. App'x 742, 745-48 (3d Cir. 2019) (citing *Dodds v. Pulte Home Corp.*, 909 A.2d 348, 351 (Pa. Super. Ct. 2006)). Under this test, a non-signatory may invoke an arbitration agreement if there is an obvious and close nexus between either (i) the non-signatory and a signatory, or (ii) the non-signatory and the contract. *Id.* at 746,

9

nn.6 & 7 (citing *Dodds*, 909 A.2d at 351); *see, e.g.*, *Richards v. Am. Acad. Health Sys., LLC*, No. 20-CV-59, 2020 WL 2615688, at *4 (E.D. Pa. May 22, 2020); *Provenzano*, 121 A.3d at 1097 ("Pennsylvania law has held that non-signatories to an arbitration agreement can enforce the agreement when there is an 'obvious and close nexus' between the non-signatories and the contract or the contracting parties.").

Defendants may invoke arbitration because there is an "obvious and close nexus" between defendants and St. Francis *and* between defendants and the Agreement. There is a nexus between defendants and St. Francis Center because, according to plaintiff's own allegations, 1412 Lansdowne Operating and Center Management Group both "owned, directed, controlled, operated, and/or managed" St. Francis Center at all relevant times. SAC ¶¶ 5, 7. In her opposition papers, plaintiff suggests that Ms. Coleman entered the Agreement before defendants "purchase[d]" St. Francis Center. Pl.'s Opp'n at 10. But plaintiff herself alleges that 1412 Lansdowne Operating bought St. Francis Center on November 3, 2014, *see* SAC ¶ 13, while Ms. Coleman was admitted to St. Francis Center on November 8, 2014, *see id.* ¶ 11; *see also* Agreement at 1 (dated November 8, 2014). Plaintiff "cannot retreat from [her] own pleadings." *Aluminium Bahrain B.S.C. v. Dahdaleh*, 17 F. Supp. 3d 461, 469 (W.D. Pa. 2014) (holding that non-signatory defendant could enforce arbitration agreement because plaintiff's own pleadings referred to defendant as an agent of the signatory).

In addition, there is a nexus between defendants and the Agreement. The Agreement expressly provides that it "shall be binding and inure to the benefit of each of the undersigned parties and their respective heirs, personal representatives, successors and assigns." Agreement at 5. The Agreement also provides that "any . . . personal injury claim or medical malpractice claim arising out of or involving the residency of the resident at the facility is subject to" the mandatory

10

arbitration agreement. *Id.* at 11. Even assuming Ms. Coleman entered the Agreement with a prior owner of the facility, by its terms, the Agreement applies to that owner's "successors and assigns," *id.* at 5, and "[s]uccessors in interest to a corporation are generally entitled to enforce their predecessors' agreements." *In re Lehman Bros. Inc.*, No. 17-CV-6246, 2018 WL 10454936, at *2 (S.D.N.Y. Sept. 26, 2018), *aff'd*, 792 F. App'x 16 (2d Cir. 2019); *see Successor*, Black's Law Dictionary (11th ed. 2019) (definition 2) (defining "successor" in the corporate context as "[a] corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation"). Plaintiff has not met her burden of showing that 1412 Lansdowne Operating, as "purchase[r]" of St. Francis Center, SAC ¶ 13, does not fall within this definition, or that her claims against either defendant do not "aris[e] out of or involv[e] the residency of the resident at the facility," Agreement at 11; *see Harrington*, 602 F.3d at 124.

Moreover, plaintiff's "[c]laims are intertwined with an arbitration agreement," in that her claims "rely on the terms of the agreement or assume the existence of, arise out of, or relate directly to, the written agreement." *Torres v. CleanNet, U.S.A., Inc.*, 90 F. Supp. 3d 369, 379 (E.D. Pa. 2015); *cf. Doe v. Trump Corp.*, 6 F.4th 400, 412-14 (2d Cir. 2021) (collecting cases where a non-signatory could compel arbitration because it was a subsidiary, affiliate, or agent of, or otherwise shared a corporate relationship with the signatory, or even in the absence of such an affiliation, "the signatory seeking to avoid arbitration treated the other signatory and non-signatory as interchangeable with respect to its rights and responsibilities under the relevant contract"); *Richards*, No. 20-CV-59, 2020 WL 2615688, at *4 (non-signatory could compel arbitration under Pennsylvania law because plaintiffs sued defendants for breach of the agreement that contained arbitration provision). Because of the nexus among defendants, St. Francis Center, and the

11

Agreement, defendants may invoke the Agreement to compel arbitration of plaintiff's claims arising from Ms. Coleman's residency at St. Francis Center.

### III. Plaintiff has not raised a genuine dispute of material fact as to unconscionability.

Plaintiff argues that the Agreement is unconscionable. *See* Pl.'s Opp'n at 12-17. "Under Pennsylvania law, the burden of establishing unconscionability lies with the party seeking to invalidate a contract, including an arbitration agreement." *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 129 (Pa. 2007). To establish that an agreement is unconscionable, a party must show both procedural unconscionability ("that there is no meaningful choice on the part of the other party regarding the acceptance of the provisions") and substantive unconscionability ("that the contractual terms are unreasonably favorable to the drafter"). *Cardinal v. Kindred Healthcare, Inc.*, 155 A.3d 46, 53 (Pa. Super. Ct. 2017); *see Glomb v. St. Barnabas Nursing Home, Inc.*, 240 A.3d 921, 921 (Pa. Super. Ct. 2020). Plaintiff has not made these showings.

#### A. Plaintiff has not shown procedural unconscionability.

Plaintiff contends that the Agreement was unconscionable because the parties were in unequal bargaining positions, the Agreement "was included in a myriad of admission documents presented to" Ms. Coleman, and Ms. Coleman signed the Agreement at a time when "she was emotionally vulnerable and ailing." Pl.'s Opp'n at 15. Plaintiff has not offered an affidavit or other evidence to support these factual contentions, and her claim fails on that basis alone.

What's more, plaintiff's allegations would not raise a genuine issue of material fact as to whether the Agreement was procedurally unconscionable. Under Pennsylvania law, "[c]ourts have refused to hold contracts unconscionable simply because of a disparity of bargaining power between the two parties." *Cardinal*, 155 A.3d at 53 (citing *Witmer v. Exxon Corp.*, 434 A.2d 1222,

12

1228 (Pa. 1981)) (holding that arbitration agreement between resident and nursing home was not unconscionable). And to the extent that plaintiff suggests that Ms. Coleman did not read all the documents that were presented to her upon her admission to St. Francis Center, because myriad documents were presented together, that argument fails because "in the absence of fraud, the failure to read a contract before signing it is an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract." *Glomb*, 240 A.3d at 921 (quotations omitted) (holding that arbitration agreement between resident and nursing home was not unconscionable). And plaintiff's suggestion that the Agreement was procedurally unconscionable because Ms. Coleman was "emotionally vulnerable and ailing" fails too. In general, "mere weakness of intellect resulting from sickness or old age is not legal grounds to set aside an executed contract if sufficient intelligence remains to comprehend the nature and character of the transaction, and no evidence of fraud, mutual mistake or undue influence is present." *Cardinal*, 155 A.3d at 50. Courts have declined to find an arbitration agreement between a resident and a nursing home procedurally unconscionable based on general allegations akin to those that plaintiff raises in her brief. *See, e.g.*, *Fox v. Jeanes Hosp.*, No. 1471 EDA 2017, 2019 WL 168493, at *11-13 (Pa. Super. Ct. Jan. 11, 2019) (affirming trial court's finding that resident's arbitration agreement with nursing home was not procedurally unconscionable based on allegations that the agreement favored the nursing home "to the detriment of its elderly and infirm patients" and that the signatory had "some challenges" in reasoning ability); *Garcia ex rel. Eckert v. HCR ManorCare, LLC*, No. 1743 MDA 2014, 2016 WL 127514, at *8 n.10 (Pa. Super. Ct. Jan. 12, 2016) (holding that although signatory to arbitration agreement with nursing home was not a sophisticated party, was 87 years old, and allegedly had "memory problems," agreement was not procedurally unconscionable, where the arbitration clause was in conspicuous typeface and

allowed 30 days to rescind); *Golden Gate Nat'l Senior Care, LLC v. Beavens*, 123 F. Supp. 3d 619, 632-33 (E.D. Pa. 2015) (finding "low, if any, indicia of procedural unconscionability" in decedent's arbitration agreement with nursing home, even though decedent's daughter was in a "vulnerable" position at the time she signed the agreement on decedent's behalf). Plaintiff has thus not established procedural unconscionability.

In arguing to the contrary, plaintiff relies on *Burkett, Jr. v. St. Francis Country House*, in which the Pennsylvania Court of Common Pleas held that a different resident's arbitration agreement with St. Francis Center was unconscionable. No. 02585, 2018 WL 3730621, at *1 (Pa. Com. Pl. Aug. 1, 2018). But the agreement in *Burkett* has significant differences from the Agreement here—most significantly, "there was no language at all, let alone in bold-faced, underlined, or capitalized typeface, highlighting that the document Mr. Burkett signed contained any provision foreclosing his mother's right to a jury trial on any and all claims she may have against St. Francis." *Id.* at *13. Moreover, plaintiff has not made nearly the evidentiary showing of unconscionability as was present in *Burkett*, where the record contained testimony that the resident suffered from dementia, that the staff "rush[ed]" the resident's son to sign the arbitration agreement, and that the resident's "only choice" of nursing homes was St. Francis Center. *Id.* at *1, *3, *5. Plaintiff has introduced no similar evidence here. *See Rivera v. PetSmart, Inc.*, No. 18-CV-2121, 2018 WL 5045380, at *3 (E.D. Pa. Oct. 17, 2018) (rejecting argument that arbitration agreement was unconscionable because plaintiff "d[id] not allege any facts in support").

**B. Plaintiff has not shown substantive unconscionability.**

A contract is substantively unconscionable where its "terms are unreasonably favorable to the drafter." *Cardinal*, 155 A.3d at 53. Plaintiff argues that this standard is satisfied here because

14

the Agreement "is overly broad" and because it contains a fee-splitting provision. Pl.'s Opp'n at 16-17. These arguments fail.

Plaintiff first contend that the Agreement is too "broad" because it "encompasses not only the present admission to the nursing home but contemplates future and unknown admissions that [Ms. Coleman] could not have contemplated" at the time she signed it. Pl.'s Opp'n at 16-17. But plaintiff does not explain why that breadth shows that the Agreement is unconscionable. Indeed, Pennsylvania courts have consistently upheld arbitration provisions that bear a strong resemblance to the agreement here. *See Glomb*, 240 A.3d at 921 (holding that arbitration agreement between resident and nursing home was not unconscionable where it contained "conspicuous, large, bolded notification that by signing, the parties agree to waive their right to a trial before a judge or jury" and allowed resident 30 days to rescind the agreement to arbitrate); *Cardinal*, 155 A.3d at 53; *Garcia*, No. 1743 MDA 2014, 2016 WL 127514, at *7-8; *MacPherson*, 128 A.3d at 1221-22; *cf. Lomax v. Care One, LLC*, 251 A.3d 1214, 1214 (Pa. Super. Ct. 2021) (affirming trial court's determination that arbitration agreement was unconscionable because it was "sparse" and "unreasonably favored the Facility, not requiring it to waive any litigation rights and allowing it to unilaterally change the terms and evict Decedent if he did not accept the modification"). Plaintiff has not justified a different conclusion.

Plaintiff fares no better in arguing that the Agreement is unconscionable because it states that the costs of arbitration "shall be borne equally by each party, and each party shall be responsible for their own legal fees." Agreement at 10; *see* Pl.'s Opp'n at 17. If "a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 92 (2000). The mere "risk" that a plaintiff "will be

15

saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Id.* at 91. Plaintiff has not alleged facts sufficient to establish that she would face prohibitive arbitration costs. *See id.* at 91-92. Moreover, courts applying Pennsylvania law have upheld arbitration agreements between a resident and a nursing home where the agreement "provides that the parties pay their own fees and costs." *MacPherson*, 128 A.3d at 1221-22 (finding arbitration agreement not unconscionable where its terms provided for fee-splitting, except that "a losing challenger to its enforcement must pay the other party's fees"); *see, e.g.*, *Riley v. Premier Healthcare Mgmt., LLC*, No. 3538 EDA 2019, 2021 WL 2287464, at *8 (Pa. Super. Ct. May 28, 2021). Plaintiff's unconscionability claim therefore fails.

### IV. The Agreement was supported by adequate consideration.

Plaintiff cursorily argues that the Agreement was not supported by consideration. *See* Pl.'s Opp'n at 18.

Plaintiff is incorrect. Under Pennsylvania law, an arbitration agreement is valid only if "there was consideration." *Mason v. Lowe's Co., Inc.*, No. 19-CV-973, 2020 WL 3574313, at *2 (W.D. Pa. June 30, 2020) (quoting *Blair v. Scott Specialty Gases*, 283 F.3d 583, 603 (3d Cir. 2002)). But "[w]hen both parties have agreed to be bound by arbitration, adequate consideration exists and the arbitration agreement should be enforced." *Curtis v. Cintas Corp.*, 229 F. Supp. 3d 312, 322 n.6 (E.D. Pa. 2017) (quoting *Blair*, 283 F.3d at 603). That standard is met here. The Agreement's arbitration provision states in capital letters that, absent a mutual agreement to mediate, arbitration "is the only legal process available to the parties" and that "mandatory arbitration has been selected with the goal of reducing the time, formalities and cost of utilizing the court system." Agreement at 6-7. Accordingly, "the language of [the Agreement] is clear that both parties agreed to be bound to the arbitration agreement." *Mason*, No. 19-CV-973, 2020 WL

16

3574313, at *2 (arbitration agreement was supported by consideration where the terms of the contract required both parties to arbitrate); *Blair*, 283 F.3d at 603 (same); *see Christopher v. Golden Gate Nat'l Senior Care, LLC*, No. 864 WDA 2017, 2019 WL 101048, at *4 (Pa. Super. Jan. 4, 2019) (reversing trial court's determination that arbitration agreement was void for lack of consideration because the agreement provided that the "speed, efficiency, and cost-effectiveness of the [arbitration] process . . . constitute good and sufficient consideration for the acceptance and enforcement" of the agreement); *cf. Lomax v. Vivint Solar Dev., LLC*, No. 20-CV-1774, 2020 WL 6781939, at *4-5 (E.D. Pa. Nov. 18, 2020) (arbitration agreement was unsupported by consideration under Pennsylvania law because parties "did not exchange mutual promises to arbitrate claims"). The Agreement is therefore supported by adequate consideration.

## V.     The action is stayed pending the outcome of arbitration.

Defendants have requested that plaintiff's entire lawsuit be stayed even if only some of plaintiff's claims are arbitrable. *See* Defs.' Br. at 6.

An action must be stayed "after all claims have been referred to arbitration and a stay [has been] requested" by either party. *Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015); *see* 9 U.S.C. § 3. Even when "fewer than all claims have been referred to arbitration, . . . the Second Circuit stated that '[t]he decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket." *Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92, 110 (S.D.N.Y. 2017) (quoting *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 856 (2d Cir. 1987)); *see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983) ("[I]t may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. That decision is one left to the district court . . . as a matter of its discretion to control its docket."). "A discretionary stay is particularly appropriate where

there is significant factual overlap between the remaining claims and the arbitrated claims." *Katsoris*, 237 F. Supp. 3d at 110-11 (quotations omitted).

These principles justify a stay. The negligence and survival claims that plaintiff brings on behalf of Ms. Coleman must be stayed because they are arbitrable. But Pennsylvania courts have consistently held that where a nursing home executed an arbitration agreement with a decedent, wrongful-death claims brought in a non-signatory heir's individual capacity are not subject to arbitration, even where the decedent's survival claims are arbitrable. *See Taylor v. Extendicare Health Facilities, Inc.*, 113 A.3d 317, 320-21 (Pa. Super. Ct. 2015), *reversed and remanded on other grounds*, 147 A.3d 490, 513 (2016); *Kohlman v. Grane Healthcare Co.*, 228 A.3d 920, 926 (Pa. Super. Ct. 2020); *Beavens*, 123 F. Supp. 3d at 633-35. Here, plaintiff did not sign the Agreement, and thus any wrongful-death claim that plaintiff brings in her individual capacity is not subject to arbitration. Nevertheless, I exercise my discretion to stay the entire case because of the "significant factual overlap" among the claims, *Katsoris*, 237 F. Supp. 3d at 111; *see, e.g.*, *Zilong Wang v. Zhihui Guo*, No. 19-CV-2884, 2020 WL 4937481, at *8 (S.D.N.Y. Aug. 22, 2020); *Catlin Syndicate 2003 v. Traditional Air Conditioning, Inc.*, No. 17-CV-2406, 2018 WL 3040375, at *7-8 (E.D.N.Y. June 18, 2018); *Winter Invs., LLC v. Panzer*, No. 14-CV-6852, 2015 WL 5052563, at *12 (S.D.N.Y. Aug. 27, 2015). Accordingly, the motion to dismiss is denied, and the action is stayed pending the outcome of arbitration.

## CONCLUSION

Defendants' motion to dismiss is denied, and defendants' motion to compel arbitration of plaintiff's claims is granted in part and denied in part. Plaintiff's wrongful-death claim is stayed pending the outcome of arbitration of all remaining claims. I do not reach defendants' remaining grounds for dismissal. *See Sinochem*, 549 U.S. at 431; *see also, e.g.*, *Lewis*, No. 19-CV-10427, 2021 WL 1199072, at *3; *In re Residential Cap., LLC*, 563 B.R. at 766; *Ramasamy*, 825 F. Supp. 2d at 467 n.1.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated: September 29, 2021
         Brooklyn, New York